In the Matter of HUNTINGTON COMMONS ASSOCIATES, an Illinois Limited Partnership, Debtor.

Appeal of Barry KREISLER.

No. 93–2902.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1994.

Decided April 5, 1994.

Paul M. Bauch (argued) and David D. Cleary, Bell, Boyd & Lloyd, Chicago, IL, for plaintiff-appellee.

Robert W. Matanky (argued), Kreisler & Matanky, Chicago, IL, for defendant-appellant and debtor.

Before POSNER, Chief Judge, CUDAHY, Circuit Judge, and McDADE, District Judge.*

CUDAHY, Circuit Judge.

Huntington Common Associates owns a multi-family housing project in Aurora, Illinois. Huntington defaulted on a loan, and GMAC Associates, one of its creditors, brought a foreclosure action in state court. Huntington then filed a Chapter 11 petition in the bankruptcy court. The parties agreed that the foreclosure action should go forward, despite the automatic stay, but that the action should be removed to the bankruptcy court. The bankruptcy proceeding was ultimately dismissed, though the bankruptcy court retained jurisdiction over the foreclosure action.

Devon Bank (the trustee) and Barry Kreisler (another defendant in the foreclosure action) petitioned Bankruptcy Judge David H. Coar to disqualify himself from the matter under 28 U.S.C. § 455(a). Judge Coar refused to do so, and Devon and Kreisler petitioned the district court for a writ of mandamus. The district court denied the petition, and Kreisler appeals.

Section 455(a) requires any "justice, judge, or magistrate of the United States" to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Kreisler argues that four incidents give rise to reasonable questions about Judge Coar's impartiality:

1. On December 21, 1992, Judge Coar granted a GMAC motion to file an amended complaint before GMAC even filed the mo-

* Hon. Joe Billy McDade of the Central District of  Illinois, sitting by designation.

tion and before the defendants received notice of it.

2. On February 9, 1993, Judge Coar denied the defendants' motion to dismiss the complaint for want of jurisdiction without briefs or argument.

3. During a February 9, 1993 hearing in which Judge Coar denied the defendants' motion to dismiss, he noted that "any predisposition this court has in this matter is a result of things that have taken place in this very courtroom," and asserted that "I am perfectly entitled to conclusions and judgments based on what takes place in the courtroom."

4. On February 23, 1993, Judge Coar took only five minutes to overrule the defendants' 30–page objection to a GMAC motion (to amend its complaint).

There is no allegation that the source of Judge Coar's alleged bias was "extrajudicial," though Kreisler seizes on Judge Coar's suggestion that he may have a "predisposition" in the matter. As Kreisler frames it, the "sole issue presented in this appeal is whether a judge who admits he has prejudged a cause" is required to recuse himself under § 455(a). Appellant's Br. at 4–5. The Supreme Court recently spoke to the question whether the "extrajudicial source requirement," applies to § 455(a). *See Liteky v. United States*, — U.S. —, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). That opinion governs our disposition here.

The principle underlying the so-called "extrajudicial source requirement" is fairly simple: "[A] judge cannot help but develop opinions about parties based on what the judge sees and hears from the bench. . . . A large part of being a judge is disciplining oneself to conduct fair proceedings and make impartial rulings despite the opinions one inevitably forms during the proceedings. . . . [A]ll judges have such opinions, and all strive to (and generally do) rule impartially despite them." *United States v. Feliciano*, 1993 WL 524338 *4, 1993 U.S.Dist. Lexis 17560, *10 (N.D.Ill.). This perhaps explains why the "extrajudicial source requirement" has a long lineage in federal law, *see Ex parte American Steel Barrel Co.*, 230 U.S. 35, 43–44, 33 S.Ct. 1007, 1009–1010, 57 L.Ed. 1379 (1913), and one with which Congress surely did not intend to break by enacting the 1974 amendments to § 455.

The common sense of the extrajudicial source factor seems to be that the parties are entitled to a decision-maker who comes to the controversy without predisposition, but not to a judge who is impervious to the impression about the litigants and the litigation which hours, days and years of judicial proceedings may induce.

The *Liteky* Court noted that the "extrajudicial source requirement," as it was commonly understood, encompassed two distinct principles that were thought to be applicable where a party sought judicial recusal. First, many courts of appeals have said that knowledge obtained either in the proceeding at hand or in an earlier proceeding could not form the basis for a required recusal, save for a narrow exception where events at trial give rise to an "unsuppressible judicial animosity." *Liteky*, — U.S. at —, 114 S.Ct. at 1152. Second, other courts have suggested that trial *rulings* cannot ever form the basis for a recusal motion, even where those rulings are the expression of a bias or motive formed outside of the courtroom. *Id.*

The Court in *Liteky* rejected these strict rule-like formulations of the extrajudicial source doctrine, saying that it is better understood as an "extrajudicial source factor." *Id.* at —, 114 S.Ct. at 1157. But that factor, the Court held, does apply to recusal motions brought under § 455(a).

The law after *Liteky*, then, is that "judicial rulings alone almost never constitute [a] valid basis for a bias or partiality motion." *Id.* Adverse rulings should be appealed; they do not form the basis for a recusal motion. Secondly, where the judge forms opinions in the courtroom, either in the current or a prior proceeding, such opinions "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at —, 114 S.Ct. at 1157.

"Thus," the Court continued, "judicial remarks during the course of trial that are

critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* (emphasis in original).

The Court noted that sufficient bias to require recusal is shown by the remark alleged to have been made by Judge Kenesaw Mountain Landis in the World War I espionage case, *Berger v. United States*, 255 U.S. 22, 28, 41 S.Ct. 230, 231, 65 L.Ed. 481 (1921): "One must have a very judicial mind, indeed, not to be prejudiced against the German–Americans in this country. Their hearts are reeking with disloyalty." [1]

While it may not take something quite that egregious, expressions of "impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" will not suffice. *Liteky,* —— U.S. at ——, 114 S.Ct. at 1157. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.*

All of Judge Coar's challenged actions consist of judicial rulings and ordinary admonishments. *Liteky* shows that Judge Coar may have slightly over-stated the law when he implied that his opinions of the parties formed in court can *never* form the basis of a recusal motion. But neither that statement nor the accompanying suggestion that he may have had some "predisposition" in the matter is even remotely sufficient evidence of the required "deep-seated and unequivocal

antagonism that would render fair judgment impossible." *Id.* The district court's denial of the petition for a writ of mandamus is therefore AFFIRMED.

---

1. Perhaps the same is true of the remarks made by Justice McReynolds, who, dissenting in *Berger*, wrote that:

> The indicated prejudice was towards certain malevolents from Germany, a country then engaged in hunnish warfare and notoriously encouraged by many of its natives, who unhappily, had obtained citizenship here [and] who were at that time wickedly abusing privileges granted by our indulgent laws.... A public officer who entertained no aversion toward disloyal German immigrants during the late

> war was simply unfit for his place. And while 'an overspeaking judge is no well-tuned cymbal,' neither is an amorphous dummy unspotted by human emotions a becoming receptacle for judicial power. It was not the purpose of Congress to empower an unscrupulous defendant seeking escape from merited punishment to remove a judge solely because he had emphatically condemned domestic enemies in time of national danger.

255 U.S. at 42–43, 41 S.Ct. at 236 (McReynolds, J., dissenting).